Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| VANGIE PORTELA VÉLEZ<br><br>*Recurrida*<br><br>v.<br><br>MANAGEMENT TEMPORARY & CONTRACT EMPLOYMENT SERVICES, INC., H/N/C/ MSSS Y OTROS<br><br>*Peticionarios* | TA2025CE00297 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV00791<br><br>Sobre: Acoso Laboral y otros |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Juez Barresi Ramos y la Jueza Santiago Calderón

Santiago Calderón, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 15 de octubre de 2025.

Comparece ante nos Management Temporary & Contract Employment Services, Inc., h/n/c MSSS, así como MSSS Sales and Marketing Inc. (en conjunto, peticionarios), mediante recurso de *Certiorari* y solicitan la revocación de la *Resolución*[1] emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro recurrido), el 4 de agosto 2025 y notificada a las partes en esa misma fecha. En el referido dictamen, el TPI determinó declarar No Ha Lugar la *Moción de Sentencia Sumaria*[2]*,* por entender que existen *controversias sobre el motivo del despido, la veracidad de las alegaciones discriminatorias y la reorganización*[3].

Por los fundamentos expuestos a continuación, se ***expide*** el auto de *certiorari* solicitado y se ***confirma*** la *Resolución* impugnada.

---

[1] *Resolución,* entrada #79 SUMAC.
[2] *Moción Sentencia Sumaria,* entrada #65 SUMAC.
[3] *Íd.*

**I.**

El 29 de enero de 2023, Vangie Portela Vélez (recurrida o señora Portela Vélez) presentó una *Querella*[4] contra MSSS, Inc. y MSSS Sales & Marketing Inc., por discrimen por impedimento, daños y perjuicios, acoso laboral y despido injustificado. En síntesis, alegó que fue empleada de los peticionarios desde el año 2015 y que ocupaba la posición de Líder de Negocio para la división de promociones y eventos. Sostuvo que fue diagnosticada con esclerosis múltiple mientras trabajaba con los peticionarios, y que, en marzo de 2019, notificó al patrono sobre su condición de salud. Además, esbozó que fue objeto de discrimen por su impedimento, acoso y hostigamiento laboral, lo cual culminó con su despido injustificado.

El 18 de mayo de 2023, los peticionarios presentaron una *Contestación a Querella*[5], en la que, en síntesis, negaron que la recurrida haya sido empleada de MSSS Sales & Marketing Inc. Del mismo modo, alegaron que nunca discriminaron, acosaron ni hostigaron por razón alguna. Sostienen que la división de Management Events, para la que fue contratada la señora Portela Vélez, sufrió una merma significativa en volumen de ventas y pérdida de clientes como consecuencia de la pandemia por Covid-19, razón por la que tuvieron que reducir la fuerza laboral.

Transcurrieron varias incidencias procesales[6], las cuales no pormenorizaremos, por no estar relacionadas a la controversia ante nuestra consideración.

---

[4] Entrada #1 SUMAC.
[5] Entrada #8 SUMAC.
[6] El 4 de diciembre de 2024, los peticionarios presentaron una *Moción de Desestimación Parcial*, en la que alegaron que las causas de acción por despido injustificado y por acoso laboral estaban prescritas. El 13 de enero de 2025, la recurrida presentó una *Moción de Desistimiento Parcial*, en la que desistió de sus reclamaciones por despido injustificado, acoso laboral y daños extracontractuales, sin embargo, continuó su reclamación bajo las leyes Núm. 44 y 115. El 17 de enero de 2025, el TPI emitió una *Sentencia Parcial*, en la que declaró ha lugar la solicitud de desistimiento parcial presentada por la recurrida.

El 21 de febrero de 2025, los peticionarios presentaron una *Moción de Sentencia Sumaria*[7], y solicitaron que se desestimara, tanto la causa de acción de discrimen al amparo de la *Ley para Prohibir el Discrimen Contra las Personas con Impedimentos Físicos, Mentales o Sensoriales,* Ley Núm. 44 de 2 de julio de 1985, ("Ley núm. 44-1985")[8], y la reclamación por concepto de represalias al amparo de la *Ley Contra el Despido Injusto o Represalias a todo Empleado por Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial,* Ley Núm. 115 de 20 de diciembre de 1991 ("Ley núm. 115-1991")[9].

Como parte de la prueba presentada en la *Moción de Sentencia Sumaria,* los peticionarios sometieron declaraciones juradas de Ivonna Pacheco, Armando Aranda, extractos de la deposición de la señora Portela Vélez, así como documentos, a saber: contrato de empleo, solicitud de acomodo razonable, correo electrónico del 3 de julio de 2020, autorización para trabajar remoto, correo electrónico del 28 de julio de 2020, Órdenes Ejecutivas, correo electrónico del 23 de abril de 2020. Además, expusieron 75 hechos materiales que no están en controversia.

El 28 de abril de 2025, la señora Portela Vélez presentó una *Moción en Oposición a Moción de Sentencia Sumaria*[10], en la que arguyó que presentó evidencia directa y circunstancial que demuestra las actuaciones discriminatorias y en represalias por razón de su condición de esclerosis múltiple y de sus solicitudes de acomodo razonable. Enfatizó que, determinar si los comentarios fueron discriminatorios, si ocurrieron y si forman parte de un patrón hostil, es un contexto de credibilidad que solo puede resolverse en un juicio plenario. En cuanto al argumento sobre la reorganización

---

[7] Entrada #65 SUMAC.
[8] 1 LPRA sec. 501 *et seq.*
[9] 29 LPRA sec. 194 *et seq.*
[10] Entrada #69 SUMAC.

por agotamiento de fondos PPP durante la pandemia, la señora Portela Vélez arguyó que es una justificación post hoc, usada para apoyar la moción dispositiva y que, además, no aparece en la contestación a la querella ni en las respuestas a interrogatorios. Asimismo, sostuvo que, tras su despido, las funciones que desempeñaba no fueron eliminadas, sino que fueron reasignadas a Lianie Rivera Núñez. Presentó como prueba la deposición que le fue tomada durante el proceso judicial en el caso de autos.

El 4 de agosto de 2025, el TPI emitió *Resolución*[11] y realizó las siguientes determinaciones de hechos incontrovertidos:

1. MSSS fue fundada en el 1982 por Alma Iris Acosta, quien ocupa el puesto de Chief Excecutive Officer. La compañía se dedica principalmente a proveer a patronos a servicios de reclutamiento, capacitación, desarrollo organizacional, empleados temporeros y por contrato, así como consultoría de recursos humanos.

2. MSSS tiene una división que ofrece servicios de planificación, organización y coordinación y supervisión de eventos corporativos. Dicha división se conoce como Management Events.

3. La división de Management Events está a cargo de producir eventos como graduaciones y conciertos, así como promociones para distintos clientes.

4. Portela Vélez comenzó a trabajar para MSSS el 4 de mayo de 2015 como Business Leader de la división de Management Events.

5. Durante el empleo de Portela Vélez en MSSS, Mónica Quiñones supervisaba la división de Management Events, pero su función principal como Senior Vice President of Operations era la supervisión de la división de empleos temporeros de MSSS.

6. Entre diciembre de 2018 y marzo de 2019, Portela Vélez le indico verbalmente a su supervisora Mónica Quiñones sobre su posible diagnóstico de esclerosis múltiple.

7. Desde aproximadamente diciembre de 2018, algo antes, Portela comenzó a visitar médicos para atender su condición de esclerosis múltiple.

8. El 29 de marzo de 2019, Portela Vélez fue diagnosticada con esclerosis múltiple.

9. El esposo de la Dra. Patricia De Jesús fue quien diagnostico la condición de esclerosis múltiple.

10. En marzo de 2019, cuando notifica el diagnostico a la supervisora, en ese momento, Portela Vélez, inicialmente solicito tiempo para poder ir a sus estudios y citas médicas.

11. Portela Vélez comenzó a solicitar citas médicas antes de marzo de 2019, como resultado de su condición de esclerosis múltiple.

---

[11] Entrada #79 SUMAC.

12. Portela Vélez solicito por escrito ir a las visitas médicas cada tres meses y acudir a recibir infusiones cada seis meses.

13. Portela Vélez declaro que en una ocasión le indico a Mónica Quiñones: "Mira, tengo que ir a la cita con el gastroenterólogo porque me siento super mal del estómago, estoy grave. No sé qué me pasa".

14. Portela Vélez expresó que comenzó a faltar cuando empezó a sentir unas cosas bien locas en su cuerpo; que no se podía parar de la cama. Cada vez que se paraba, perdía el control de sus caderas y se iba a caer.

15. Todos los acomodos solicitados fueron concedidos, sin que ninguno le hubiere sido denegado.

16. Portela Vélez solicito utilizar calzado cómodo o tenis, lo que fue permitido.

17. En otra ocasión, ya que Portela Vélez tenia los nervios inflamados, solicito, y la compañía aprobó y removió el segundo tubo o bombilla a todas las lámparas del piso donde ubicaba la oficina de la querellante y le dio acceso directo al segundo piso mientras que el resto de los empleados tenían que subir al tercer pido para entonces bajar al segundo.

18. De igual manera, solicito un estacionamiento más cerca, lo que también le fue concedido temporeramente, que Portela Vélez describe como por "muy buen tiempo".

19. De la Solicitud de acomodo surge que el 30 de junio de 2020, la querellante solicito trabajar unos días remoto y otros presencial debido al Covid-19 y a que no tenía cuido para su hijo, lo cual fue concedido.

20. Inicialmente la solicitud le fue autorizada hasta el 20 de julio de 2020. Posteriormente, la autorización para trabajar remoto fue extendida hasta el 10 de agosto de 2020.

21. El 12 de marzo de 2020, la entonces gobernadora Wanda Vázquez Garced emitió una Orden Ejecutiva 2020-020 decretando un estado de emergencia debido a la pandemia del Covid-19.

22. Posteriormente, mediante la Orden Ejecutiva núm. 2020-023 del 15 de marzo de 2020, la Gobernadora estableció un lockdown, un toque de queda, y ordenó el cierre de los establecimientos comerciales, con limitadas excepciones. Inicialmente, dicho cierre tuvo vigencia hasta el 30 de marzo de 2020, pero éste fue extendiéndose de tiempo en tiempo.

23. La Sección 5 de dicha Orden Ejecutiva 2020-023 prohibió expresamente todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

24. El 30 de marzo de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-29 para, entre otros asuntos, extender las disposiciones del toque de queda, de cierre, así como para mantener la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

25. Durante el período de vigencia de la Orden Ejecutiva 2020-29, las personas debían permanecer en sus hogares veinticuatro (24) horas al día, excepto para acudir a citas médicas, adquirir alimentos o proveer asistencia a personas de la tercera edad, menores de edad o personas

con impedimentos. Además, esta medida extendió el cierre de las actividades comerciales en Puerto Rico con limitadas excepciones.

26. El 12 de abril de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-033 para, entre otras cosas, extender las medidas de cierre y toque de queda, así como para mantener la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

27. Particularmente, la Orden Ejecutiva 2020-033 extendió el cierre de las operaciones del gobierno y el toque de queda de veinticuatro (24) horas, con la excepción de que las personas podían salir únicamente entre 5:00 a.m. a 9:00 p.m. para acudir a citas médicas, comprar alimentos, medicina y otros servicios limitados. El resto de los establecimientos debían permanecer cerrados, a no ser que ofrecieran servicios esenciales.

28. El 1 de mayo de 2020, la gobernadora emitió la Orden Ejecutiva núm. 2020-038 y enumeró en ella ciertos sectores que estarían autorizados a retomar sus operaciones el 11 de mayo de 2020. Además, requirió que las personas se mantuvieran en sus hogares, pero permitió: la salida entre 5:00 a.m. a 7:00 p.m. para acudir a citas médicas, comprar comida o medicamentos y recibir o brindar algún servicio exento; y la salida entre 5:00 a.m. a 3:00 p.m. para realizar actividades físicas.

29. Mediante esta Orden Ejecutiva núm. 2020-038 se volvió a mantener la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

30. El 21 de mayo de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-041 para, entre otras cosas, extender el toque de queda hasta el 15 de junio de 2020 e implantar una reapertura gradual de varios sectores económicos.

31. Nuevamente, se mantuvo la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

32. El 12 de junio de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-044 para, entre otros asuntos, permitir la operación de los negocios de venta al detal y los centros comerciales de formato abierto y otros con una ocupación máxima del cincuenta por ciento (50%). Esta medida también mantuvo un toque de queda entre 10:00 p.m. a 5:00 a.m.

33. Otra vez, se mantuvo la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

34. El 29 de junio de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-048. En esta ocasión, extendió el toque de queda entre 10:00 p.m. y 5:00 a.m. hasta el 22 de julio de 2020 y permitió el regresó escalonado de algunos empleados públicos.

35. No obstante, mantuvo la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar".

36. Debido al aumento de los casos de COVID-19 en Puerto Rico, el 16 de julio de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-054 para, entre otras cosas, adoptar medidas más restrictivas para controlar la

propagación del virus y: extender el toque de queda establecido de 10:00 p.m. a 5:00 a.m. hasta el 31 de julio de 2020; limitar la ocupación máxima de establecimientos a un cincuenta por ciento (50%) y prohibir la operación de establecimientos de bebidas alcohólicas.

37. Mantuvo, además, la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar", que no estuviere autorizado por la Orden Ejecutiva.

38. El 31 de julio de 2020, la Gobernadora emitió la Orden Ejecutiva núm. 2020-060 y extendió el toque de queda hasta el 15 de agosto de 2020. Asimismo, impuso un cierre los domingos que solo permitía la salida de los hogares para atender a citas médicas, emergencias o comprar alimentos. Esta orden mantuvo cierres comerciales y restricciones de ocupación máxima.

39. Asimismo, mantuvo la prohibición de todo "evento que propicie la reunión de un grupo de ciudadanos en el mismo lugar", que no estuviere autorizado por la Orden Ejecutiva.

40. Ivonna Pacheco declaró que, durante la pandemia, la división de Management Events, no podía producir negocios y estaba impedida de hacer eventos de manera presencial, debido a la orden ejecutiva relacionada a la pandemia en Puerto Rico.

41. Entre marzo y agosto de 2020, la división de Management Events no organizó ningún evento presencial.

42. MSSS para enfrentar el impacto de la pandemia, la compañía solicito y le fueron concedidos prestamos bajo el Payroll Protection Program (en adelante, "PPP").

43. La evaluación que cubre el periodo de enero a diciembre de 2019 indica que "Vangie Portela tiene que mejorar sus tiempos y mejorar en cumplir con su asistencia y puntualidad".

44. Ivonna Pacheco admitió que, si la querellante solicita trabajo en la empresa, "ante esta situación en que estamos no creo que sea una persona que consideraríamos".

El foro primario concluyó que no procedía dictar sentencia sumaria, ya que persisten controversias de hechos sustanciales y materiales que impiden la resolución del caso por la vía sumaria, a saber:

1. Si el despido de Portela Vélez fue motivado por una reorganización como consecuencia de la pandemia o un subterfugio para discriminar y tomar represalias.

2. Si las alegadas expresiones negativas hacia la querellante ocurrieron y reflejan un patrón de discrimen por impedimento.

3. Si la posición de Portela Vélez fue eliminada como consecuencia de la alegada reorganización o si fue ocupada por otra empleada.

Insatisfechos, el 14 de agosto de 2025, los peticionarios acuden ante nos mediante recurso de *Certiorari* y le imputan al TPI la comisión de los siguientes errores:

A. Erró y abusó de su discreción el Honorable Tribunal de Primera Instancia al no dar por admitidos los hechos que la querellante no controvirtió con prueba admisible conforme requiere la Regla 36 de Procedimiento Civil.

B. Erró el Honorable Tribunal de Primera Instancia al concluir que existen controversias genuinas sobre hechos materiales que impiden que se dicte sentencia sumaria a favor de la compañía.

C. Erró y abusó de su discreción el Tribunal de Primera Instancia al no desestimar las causas de acción por alegado discrimen y alegadas represalias sobre las cuales la querellante no presentó prueba alguna para establecer que las razones ofrecidas por el patrono para su despido fueron un pretexto para discriminar y/o tomar represalias en su contra.

El 3 de septiembre de 2025, los peticionarios presentaron una *Urgente Moción en Auxilio de Jurisdicción*. Ese mismo día, la recurrida presentó una *Moción de Desestimación por Falta de Jurisdicción y/o Memorando en Oposición a la Expedición del Auto en Cumplimiento con Resolución y en Oposición a Moción en Auxilio de Jurisdicción*. Al día siguiente, sin el permiso ni autorización de esta Curia, las partes presentaron un sinnúmero de mociones a saber: *Moción para que se Excluya "Moción de Desestimación por Falta de Jurisdicción" del Récord de Autos*, presentada por los peticionarios; *Oposición a Moción para que se Excluya Moción de Desestimación por Falta de Jurisdicción del Récord de* Autos, presentada por la señora Portela Vélez; *Réplica a "Oposición a Moción para que se Excluya Moción de Desestimación por Falta de Jurisdicción del Récord de Autos"*, también presentada por los peticionarios; y por último, la recurrida sometió *Moción para Solicitar Toma de Conocimiento Judicial*. Todas estas mociones presentadas el 4 de septiembre de 2025, se declaran **no puestas,** por incumplir con nuestro Reglamento[12].

---

[12] Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, pág. __, 215 DPR __ (2025).

Con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica aplicable a los asuntos ante nuestra consideración.

**II.**

**-A-**

El Tribunal Supremo de Puerto Rico ha expresado en varias ocasiones que la sentencia sumaria es un remedio extraordinario y discrecional que sólo se debe conceder cuando no existe una controversia genuina de hechos materiales y lo que resta es aplicar el derecho[13]. En términos generales, al dictar sentencia sumaria, el tribunal deberá hacer lo siguiente:

(1) analizar los documentos que acompañan la solicitud de sentencia sumaria y los que se incluyen con la moción en oposición, así como aquellos que obren en el expediente del tribunal;

(2) determinar si el oponente de la moción controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos[14].

Analizados estos criterios, el tribunal no dictará sentencia sumaria cuando existan hechos materiales y esenciales controvertidos; cuando haya alegaciones afirmativas en la demanda que no han sido refutadas; cuando surja de los propios documentos que acompañan la moción una controversia real sobre algún hecho material y esencial, o cuando como cuestión de derecho, no procede[15]. La sentencia sumaria se puede dictar a favor o en contra de la parte que la solicita, según proceda en Derecho[16].

Por tratarse de un remedio discrecional, el uso del mecanismo de sentencia sumaria tiene que ser mesurado y solo procederá cuando el tribunal quede claramente convencido de que tiene ante sí documentos no controvertidos[17]. De tal manera, solo procede

---

[13] *Maldonado v. Cruz*, 161 DPR 1, 39 (2004).
[14] *Vera v. Dr. Bravo*, 161 DPR 308, 334 (2004).
[15] *Íd.*, págs. 333-334.
[16] *Maldonado v. Cruz, supra.*
[17] *Íd.*, pág. 334.

dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia[18]. Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria[19]. **Cualquier duda sobre la existencia de una controversia sobre los hechos materiales, debe resolverse contra la parte promovente[20]. Toda inferencia que se haga a base de los hechos y documentos que obren en los autos, debe tomarse desde el punto de vista más favorable al que se opone a la solicitud de sentencia sumaria[21]. Así pues, tomando en consideración que la sentencia sumaria es un remedio de carácter discrecional, "[e]l sabio discernimiento es el principio rector para su uso porque, mal utilizada, puede prestarse para despojar a un litigante de 'su día en corte', principio elemental del debido proceso de ley"[22].**

Es importante mencionar que, este Tribunal utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una moción de sentencia sumaria[23]. Por consiguiente, los criterios que este foro intermedio debe tener presentes al atender la revisión de una sentencia sumaria son los siguientes:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

---

[18] *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 DPR 714 (1986).
[19] *Metrop. de Préstamos v. López de Victoria*, 141 DPR 844 (1996).
[20] *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563 (1997).
[21] Véase, *Piñero v. AAA*, 146 DPR 890 (1998); *Audiovisual Lang. v. Sist. Est. Natal Hnos., supra.*
[22] *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990) (énfasis suplido).
[23] *Íd.*

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[24].

**-B-**

Atinente al caso de autos, junto a la sentencia sumaria tradicional, existe una modalidad de solicitud de sentencia sumaria aplicable cuando el promovente alega que su adversario no cuenta con evidencia suficiente para prevalecer en el juicio. La llamada sentencia sumaria por insuficiencia de prueba fue reconocida por el Tribunal Supremo en *Medina v. M.S. & D. Química P.R., Inc.*[25]. Según esta decisión, después de que las partes hayan realizado un adecuado y apropiado descubrimiento de prueba, el promovente puede presentar una moción de sentencia sumaria en la que alegue que su adversario no cuenta con evidencia suficiente para, al menos, probar un elemento esencial e indispensable de su reclamación[26].

Advertimos, sin embargo, que la jurisprudencia citada requiere que el promovente de la moción de sentencia sumaria por insuficiencia de prueba alegue y demuestre todos los elementos requeridos para que prevalezca una moción de sentencia sumaria "tradicional", más el elemento adicional de insuficiencia de la prueba. Esto se debe a que "[a] la modalidad de sentencia sumaria por insuficiencia de la prueba le aplican todas las normas y principios que tradicionalmente hemos indicado deben utilizarse por los tribunales al entender en una moción de sentencia sumaria"[27]. Si existiera duda sobre si hay prueba suficiente o no en torno a alguna controversia de hecho relevante, los tribunales deben denegar la solicitud de sentencia sumaria por ese fundamento[28].

---

[24] *Roldán Flores v. M Cuebas*, 199 DPR 664, 679 (2018).
[25] 135 DPR 716 (1994).
[26] *Íd.*, pág. 732.
[27] *Íd.*, pág. 734.
[28] *Íd.*

El promovente de una moción de sentencia sumaria por insuficiencia de prueba no puede descansar solo en una simple alegación de que el demandante no tiene evidencia suficiente para probar su caso. Es decir, **tiene que demostrar que se ha llevado a cabo un descubrimiento de prueba completo, adecuado y apropiado. Ello significa que tiene que presentarle al tribunal suficientes elementos de juicio para poder evaluar la adecuacidad del descubrimiento realizado**[29]. No se considerará adecuado el descubrimiento de prueba cuando de un análisis de los documentos se refleja que la parte promovente ha dejado de auscultar alguna información que le pudiera haber conducido a obtener alguna prueba admisible[30].

Además, debe persuadir al juzgador de que: (1) no es necesario celebrar una vista evidenciaria o el juicio en su fondo; (2) el demandante no cuenta con suficiente evidencia para probar al menos un hecho esencial de su reclamación, y (3) procede la desestimación de la reclamación como cuestión de derecho[31]. Si la parte promovente, luego de haber transcurrido un tiempo adecuado y razonable para el descubrimiento de prueba, puede demostrar que del récord del tribunal surge que la parte promovida no cuenta con evidencia suficiente para probar un elemento esencial de su caso sobre la cual tiene el peso de la prueba, procede que se dicte sentencia sumaria para desestimar la demanda[32].

Por su parte, para poder derrotar una moción de sentencia sumaria bajo la modalidad de la insuficiencia de prueba el promovido puede: (1) presentar una oposición conteniendo prueba admisible en evidencia, o prueba que pueda convertirse en admisible, o que dé lugar a prueba admisible, que demuestre la

---

[29] *Íd.*, pág. 733.
[30] *Íd.*
[31] *Íd.*, págs. 733-34.
[32] *Íd.*

existencia de evidencia para probar los elementos esenciales de su caso; (2) alegar que hay prueba en el récord que puede convertirse en admisible que derrotaría la contención de insuficiencia; (3) exponer que la moción es prematura porque el descubrimiento es inadecuado, está a medias o no se ha realizado; o, (4) que el caso, por su naturaleza, no es uno conveniente para que se resuelva por el mecanismo de sentencia sumaria[33].

Sostiene el tratadista Echavarría Vargas que, "la solicitud de sentencia sumaria por insuficiencia de prueba solo debe prosperar en aquellas ocasiones en las cuales no exista ninguna prueba. No es un asunto de credibilidad o de fuerza de la prueba, sino de inexistencia de evidencia"[34].

**III.**

En el caso de autos, debemos determinar si procedía declarar *No Ha Lugar* la *Moción de Sentencia Sumaria* presentada por los peticionarios. Estos, alegan que el TPI incidió al emitir la *Resolución* aquí impugnada; esto, por abusar de su discreción, al no dar por admitidos los hechos que la recurrida no controvirtió con prueba admisible conforme requiere la Regla 36 de Procedimiento Civil; al concluir que existen controversias genuinas sobre hechos materiales que impiden que se dicte sentencia sumaria a favor de la compañía y; por último, al no desestimar las causas de acción por alegado discrimen y alegadas represalias sobre las cuales la recurrida no presentó prueba alguna para establecer que las razones ofrecidas por el patrono para su despido fueron un pretexto para discriminar y/o tomar represalias en su contra.

---

[33] *Íd.,* pág. 734.
[34] J. A. Echavarría Vargas, *Procedimiento Civil Puertorriqueño*, Colombia, 2012, pág. 221.

Tras un análisis minucioso del expediente ante nuestra consideración, resolvemos que el foro recurrido no incidió en su determinación. Veamos.

Según adelantamos en la exposición del derecho, el primer paso del estándar de revisión de las solicitudes de sentencia sumaria es revisar el expediente *de novo* de la forma más favorable para la parte que se opuso a la solicitud de sentencia sumaria, y aplicar los mismos criterios de la Regla 36 de Procedimiento Civil, *supra*[35]. De igual forma, el segundo paso exige que revisemos que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra*[36]. Ahora bien, luego de examinada la solicitud de sentencia sumaria como su oposición, determinamos que ambos escritos cumplieron con los requisitos de la Regla 36 de Procedimiento Civil, *supra*. Por lo tanto, corresponde continuar al tercer criterio del aludido estándar de revisión apelativa sobre las solicitudes de sentencia sumaria.

El tercer paso, conlleva revisar si en realidad existen hechos materiales en controversia. De haberlos, debemos cumplir con la exigencia establecida en la Regla 36.4 de Procedimiento Civil, *supra*, y exponer cuáles son los hechos materiales que están en controversia y cuáles son incontrovertidos. Luego de una revisión exhaustiva del expediente, concluimos que existen hechos en controversia.

Pasamos al cuarto y último eslabón; por lo que, debemos revisar de *novo* si el TPI aplicó correctamente el derecho[37].

En particular, debemos resolver si la señora Portela Vélez establece un caso prima facie de discrimen y, a su vez, participó de una actividad protegida por la Ley Núm. 115-1991, *supra*.

---

[35] *Roldán Flores v. M. Cuebas, supra*, pág. 679.
[36] *Íd.*
[37] *Íd.*

Nuestro ordenamiento jurídico de derecho laboral requiere que, en la reclamación de discrimen por impedimento y represalia, la señora Portela Vélez demuestre, primeramente, que (1) pertenece a la clase protegida por la legislación; (2) está cualificada para el puesto; (3) fue objeto de una acción adversa; y (4) se benefició a otra persona que no pertenece al mismo grupo protegido. Los cuatro criterios surgen de la reclamación presentada[38].

Ahora bien, una vez se ha establecido el caso prima facie de discrimen, corresponde al patrono demostrar que hay una explicación razonable para la acción adversa en contra del reclamante y que no existe ánimo discriminatorio. Lo cual hicieron los peticionarios. Así pues, en nuestro esquema probatorio le corresponderá a la señora Portela Vélez en la vista en su fondo refutar la explicación razonable ofrecida por el patrono como cualquier controversia que se tramita en los tribunales. Es decir, la parte demandante deberá hacer ver que la razón ofrecida es en realidad un subterfugio o pretexto para justificar la acción adversa[39]. Bajo este esquema, el peso de convencer al juzgador permanece siempre sobre el reclamante[40].

Por lo cual, la determinación a la que allega el TPI es correcta en derecho y, por tanto, requiere celebrar un juicio para evaluar la prueba sobre el motivo del despido, la veracidad de las alegaciones discriminatorias y la reorganización[41]. En consecuencia, colegimos que, ninguno de los errores señalados por la parte peticionaria, fue cometido por el TPI.

---

[38] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).
[39] *Guías para la Interpretación de la Legislación Laboral de Puerto Rico* 1era. Edición 8 de mayo de 2019, citando *Joy Goncalves v. Plymouth County Sheriff's Department,* 659 F.3d 101, 105 (1st Cir. 2011).
[40] *Íd.*, citando *Ibañez v. Molinos de Puerto Rico*, 114 DPR 42, 48 (1983).
[41] Entrada #79 SUMAC.

**IV.**

Por los fundamentos que anteceden, ***expedimos*** el auto de *certiorari* solicitado y ***confirmamos*** la *Resolución* recurrida.

Notifíquese.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones. La Juez Barresi Ramos concurre sin voto escrito.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones